Argued and submitted June 20, judgment dismissing claim for injunctive relief affirmed; otherwise reversed and remanded October 19, 2005

John JOHNSON,
individually and for all others similarly situated,
*Appellant,*

*v.*

SAIF CORPORATION,
an Oregon public corporation,
and Brenda Rocklin,
*Respondents.*

0207-07157; A123541

122 P3d 66

Meagan A. Flynn argued the cause for appellant. With her on the briefs was Preston Bunnell & Stone, LLP.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman* and Ortega, Judges.

LANDAU, P. J.

---

* Schuman, J., *vice* Richardson, S. J.

**LANDAU, P. J.**

Plaintiff initiated this action under 42 USC section 1983 against SAIF Corporation (SAIF) and its president and chief executive officer, Rocklin[1] (collectively, defendants). He alleges that defendants deprived him of his right to due process under the Fourteenth Amendment to the United States Constitution by terminating his permanent total disability (PTD) benefits without a pretermination hearing. He seeks both damages and an injunction compelling defendants to provide him with a pretermination hearing. Defendants moved for summary judgment on the ground that, among other things, defendants are not "persons" who are subject to suit under 42 USC section 1983. Plaintiff filed a cross-motion for summary judgment on the merits of his claims. The trial court granted summary judgment in favor of defendants, denied plaintiff's cross-motion, and entered judgment dismissing plaintiff's claims. Plaintiff now appeals, arguing that the trial court erred in entering summary judgment dismissing his claims and in denying his cross-motion for summary judgment on the merits.

We conclude that, except as to plaintiff's claim for prospective injunctive relief, the trial court erred in granting defendants' motion for summary judgment. We do not, however, address whether the court erred in denying plaintiff's cross-motion, because the court did not address that motion on the merits. We therefore affirm as to the dismissal of the claim for injunctive relief, but otherwise reverse and remand.

## I. BACKGROUND

We begin with a brief description of the state-law context for plaintiff's federal law claims and the facts on which they are based. We then follow with a summary of the relevant facts, to which the parties have stipulated.

---

[1] The president and CEO of SAIF at the time of the hearings actually was Katherine Keene. When she left the company, its new president and CEO, Cecil Tibbetts, was substituted. He has since left, as well, and Brenda Rocklin now holds the position.

## A. *Review of PTD benefits*

Oregon workers' compensation law provides for the payment of PTD benefits if, as a consequence of a work-related injury, a worker is adjudged permanently and totally "incapacitated from regularly performing work at a gainful and suitable occupation." ORS 656.206(5). The law further provides that the insurer paying PTD benefits to a worker must review that award at least every two years to determine whether the worker continues to be incapable of gainful and suitable employment. *Id.* If the worker becomes capable of gainful and suitable employment, the insurer may end the payment of benefits or substitute partial disability benefit payments, as appropriate.

The statutes do not provide for a hearing before any termination of PTD benefits. Administrative rules, however, do impose certain procedures that must be followed before the termination may occur. The insurer must notify the worker of its decision to terminate PTD benefits and provide the worker full access to the information that the insurer relied on in making its decision. OAR 436-030-0065(1). The worker then has the opportunity to request an evidentiary hearing before the Hearings Division of the Workers' Compensation Board. OAR 436-030-0065(6). Either party may appeal the decision of the administrative law judge (ALJ) to the Workers' Compensation Board (board). ORS 656.289(3); ORS 656.295. Decisions of the board, in turn, are subject to judicial review by this court. ORS 656.298.

## B. *Stipulated facts*

The parties stipulated to the following facts. SAIF is an Oregon independent public corporation that provides workers' compensation insurance to Oregon employers. Rocklin is the president and chief executive officer of SAIF. At all relevant times, she and her predecessors acted in their official capacities.

In 1981, plaintiff was employed by a company that purchased workers' compensation insurance from SAIF for the benefit of its employees. That year, he was injured on the job. Plaintiff ultimately was adjudicated to be permanently

and totally disabled as a result of his occupational injury. SAIF began paying monthly PTD benefits.

In 2001, SAIF conducted its biennial review of plaintiff's PTD benefits, as required by law. SAIF notified plaintiff that it was in the process of reevaluating his entitlement to the benefits. Plaintiff was evaluated by several physicians and a rehabilitation counselor at SAIF's expense. As a result of those evaluations, SAIF determined that plaintiff was no longer entitled to permanent total disability, but that he was instead entitled to permanent *partial* disability. SAIF sent plaintiff the required notification of its determination.

Plaintiff requested, and obtained, an evidentiary hearing at which he was permitted to testify, to present evidence—including his own expert medical and vocational testimony—to cross-examine SAIF witnesses, and to otherwise contest SAIF's determination that he was no longer entitled to PTD benefits. The ALJ upheld SAIF's determination that plaintiff was capable of suitable and gainful employment and, as a result, no longer entitled to PTD benefits. The Workers' Compensation Board affirmed the ALJ's decision. This court ultimately affirmed the board without opinion. *Johnson v. SAIF*, 200 Or App 414, 115 P3d 988 (2005).

In the meantime, plaintiff initiated this action under 42 USC section 1983—commonly referred to as "section 1983"—contending that SAIF and Rocklin, acting in her official capacity, both acted under color of state law in depriving him of due process of law by failing to afford him a hearing *before* terminating his PTD benefits.[2] Plaintiff stipulated that defendants did not violate Oregon law. His sole claim is that, by following the procedures set out in state statutes and administrative rules, defendants violated his federal right to due process of law. He requested both monetary and injunctive relief, including damages beyond the mere restoration of his PTD benefits.

Defendants moved for summary judgment, relying on four grounds for disposing of plaintiff's claims as a matter of law.

---

[2] Plaintiff filed the claim as a class action, but at the time the court ruled on the summary judgment motions, he had not yet sought certification of the class.

First, defendants argued that they are not "persons" who are subject to liability under section 1983. According to defendants, under *Will v. Michigan Dept. of State Police*, 491 US 58, 109 S Ct 2304, 105 L Ed 2d 45 (1989), the statutory reference to "persons" who are subject to suit does not include a state, its agencies, or its officials who are sued in their official capacities for damages. Defendants argued that SAIF is an agency of the state, created by the state for a public purpose. Moreover, they argued, at least with respect to the claim for damages, Rocklin is not a "person" within the meaning of the statute, because she is being sued for actions taken in her official capacity.

Second, defendants argued that, even if they are "persons" within the meaning of section 1983, their actions still do not subject them to liability under that statute because those actions were not taken "under color of state law," as the statute requires.

Third, defendants argued that the claim for prospective injunctive relief against Rocklin is moot in light of the fact that plaintiff eventually received the full-blown evidentiary hearing that he requested.

Fourth, defendants argued that, at all events, plaintiff's due process claim is barred by claim preclusion. According to defendants, plaintiff could have raised his due process claim when he challenged the termination of his PTD benefits before the ALJ and the Workers' Compensation Board.

Plaintiff filed a cross-motion for summary judgment on the merits of his due process claim. He also responded to each of defendants' four arguments in support of their motion as follows.

First, he contended that SAIF is indeed a "person" within the meaning of section 1983. He argued that, although SAIF is a public corporation with many of the attributes of a state agency, it is also statutorily exempted from being treated like a state agency in a number of important respects.

Second, he argued that defendants did act "under the color of state law." He argued that, under controlling federal case law, an entity that is not an arm of the state nevertheless can act under color of state law for section 1983 purposes.

Third, plaintiff argued that, even if it is true that he already obtained the hearing that he requested, the fact remains that his claim for injunctive relief is not moot because it is subject to the federal exception to the doctrine of mootness that applies to cases that are "capable of repetition, yet evading review."

Finally, plaintiff argued that his due process claim is not subject to preclusion because neither the ALJ nor the Workers' Compensation Board could have provided him with the relief that he requested on that claim.

The trial court granted defendants' motion. The court explained that the primary ground of its decision was the fact that defendants are not "persons" within the meaning of section 1983 and that the claim for injunctive relief is moot. The court went on to say that, if it were wrong about either of those conclusions, it would have granted the motion on the other grounds advanced by defendants. The court explained that, because it granted defendants' motion on those grounds, it necessarily denied plaintiff's cross-motion as well, although without reaching the merits of the constitutional issue.

## II. ANALYSIS

On appeal, plaintiff assigns error both to the entry of summary judgment in favor of defendants and to the denial of plaintiff's cross-motion. Because the parties have stipulated to the facts, the only issues are legal. Accordingly, we review the trial court's entry of summary judgment to determine whether the record establishes that defendants were entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We begin with our analysis of the parties' arguments with respect to the entry of summary judgment in favor of defendants and then address the proper disposition of their arguments on the denial of plaintiff's cross-motion.

## A. *Defendants' motion—Did plaintiff state a claim under section 1983?*

As we have noted, defendants moved for summary judgment on several grounds, namely, that they are not "persons" within the meaning of section 1983; that, even if SAIF is a section 1983 "person," it did not act "under color of state law"; that, in any event, the claim against Rocklin must be dismissed as moot; and that plaintiff's claim on the merits is barred by claim preclusion. We address each of those contentions in turn.

### 1. *Are defendants "persons" within the meaning of section 1983?*

42 USC section 1983 provides, in part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Thus, among other things, the statute applies only when a "person" deprives another of certain rights under color of state law.

In *Will,* the United States Supreme Court held that a state is not a "person" within the meaning of section 1983. The Court reasoned that the phrasing of the statute and the ordinary meaning of its terms suggested that Congress did not intend it to apply to states. The Court further reasoned that a contrary interpretation would run afoul of the immunity guaranteed to states by the Eleventh Amendment. Finding no intention to abrogate that immunity in either the text or the history of the enactment, the Court concluded that section 1983 did not apply to states. *Will,* 491 US at 64-68. The Court cautioned that its mention of the Eleventh Amendment did not mean that the scope of state immunity under that constitutional provision and the scope of the term "person" under section 1983 are identical. The Court said that the two issues are "separate." *Id.* at 66. Nevertheless, the Court

explained, the existence of Eleventh Amendment immunity was a relevant consideration in determining the intended meaning of the statutory term. *Id.*

The Court also considered whether state officials, as opposed to the state itself, are "persons" within the meaning of the statute. The Court held, "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* at 71.

a.   The test for determining who is a "person"

Unfortunately, the Supreme Court has not formulated any particular test for determining whether an individual or an entity is a "person" within the meaning of section 1983. Federal courts appear to have adopted Eleventh Amendment analysis in the apparent assumption that, if a defendant is entitled to Eleventh Amendment immunity, that defendant is not a "person" within the meaning of section 1983 and, conversely, that, if a defendant is not entitled to Eleventh Amendment immunity, that defendant is a "person" within the meaning of section 1983.[3] The problem is that the United States Supreme Court has applied no consistent

---

[3] The first assumption appears correct, as far as it goes. Given what the Supreme Court said in *Will*, if an entity is subject to immunity, then it necessarily follows that the entity is not a "person" within the meaning of section 1983. *See, e.g., Howlett v. Rose*, 496 US 356, 365, 110 S Ct 2430, 110 L Ed 2d 332 (1990) ("[A]n entity with Eleventh Amendment immunity is not a 'person' within the meaning of § 1983[.]"). But, strictly as a matter of logic, it does not necessarily follow that, if an entity is *not* subject to Eleventh Amendment immunity, that entity *is* a "person" within the meaning of section 1983. Nevertheless, federal courts appear to have adopted the notion that, if a defendant is not entitled to Eleventh Amendment immunity, it necessarily follows that the defendant is a "person" for section 1983 purposes. *See, e.g., Harter v. Vernon*, 101 F3d 334, 338 (4th Cir 1996) ("Once the Eleventh Amendment inquiry is complete there is no need to consider 'person-hood.' "); *Peters v. Delaware River Port Authority of Pennsylvania and New Jersey*, 16 F3d 1346, 1350 (3d Cir 1994) (holding that, because the port authority was not an arm of either state, it must be a "person" under section 1983). The reasoning appears to be that Congress intended the term "person" to include any and all entities that are not subject to immunity. *Cf. Owen v. City of Independence, Mo.*, 445 US 622, 635, 100 S Ct 1398, 63 L Ed 2d 673 (1980) ("[section 1983's] language is absolute and unqualified[.]"). In fact, we are aware of no case in which a court has concluded both that a defendant is not immune and is not a "person" within the meaning of section 1983. As a result, we follow what appears to be the general rule.

analysis in determining whether a particular entity is clothed with Eleventh Amendment immunity either.

Instead, the Court has variously applied tests involving anywhere from two to six different factors. In *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 US 274, 280, 97 S Ct 568, 50 L Ed 2d 471 (1977), for example, the Court addressed whether a local board of education "is to be treated as an arm of the state partaking of the state's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." Ultimately concluding that the local school board was "more like a county or city than it is like an arm of the state," the Court examined the functions and characteristics of the entity and its relationship to the state. *Id.* Specifically, the Court considered whether the entity was considered part of the "state" as a matter of state law; the degree of state supervision over its operations; the level of funding that the board received from the state; and the extent to which, again as a matter of state law, local school boards have the authority to generate revenue through the issuance of their own bonds. *Id.*

In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 US 391, 99 S Ct 1171, 59 L Ed 2d 401 (1979), however, the Court employed a different analysis in determining whether an entity created by interstate compact was subject to Eleventh Amendment immunity. Concluding that the bistate agency was not subject to immunity, the Court regarded as significant the facts that the two states involved disclaimed any intent to confer immunity; that the interstate compact itself described the agency as "a separate legal entity"; that a majority of the governing members of the agency were appointed by counties and cities—not states; that funding was provided by counties; and that the interstate compact that created the agency expressly provided that its obligations were not binding on the states. *Id.* at 401-02.

In *Hess v. Port Authority Trans-Hudson Corporation*, 513 US 30, 115 S Ct 394, 130 L Ed 2d 245 (1994), the Court shifted gears somewhat. In determining whether a bistate port authority is cloaked with Eleventh Amendment

immunity, the Court mentioned the fact that the usual indicators of immunity pointed in different directions. Among other things, the Court noted that the implementing legislation did not refer to the authority as a state agency; that port authority functions are "not readily classified as typically state or unquestioningly local"; and that the states involved lacked fiscal responsibility for the agency. *Id.* at 44-45. In light of what it characterized as those conflicting indicators of immunity, the Court turned to what it characterized as "the impetus for the Eleventh Amendment," namely the protection of state treasuries. *Id.* at 48. The Court observed that lower courts have come to recognize "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Id.* The Court noted that, in light of the port authority's "private funding" and "financial independence," the Eleventh Amendment did not apply. The "proper focus," the Court explained, is on who bears the brunt of the entity's losses and debts: "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No'—both legally and practically—then the Eleventh Amendment's core concern is not implicated." *Id.* at 51.

Then, in *Regents of the University of California v. Doe*, 519 US 425, 117 S Ct 900, 137 L Ed 2d 55 (1997), the Court characterized the relevant inquiry still differently. At issue in that case was whether the fact that the federal government agreed to indemnify a state instrumentality—a state university laboratory doing contract work with the federal Department of Energy—divested the state agency of its Eleventh Amendment immunity. The Court held that it did not. In reaching that conclusion, the Court noted that some of its cases had focused on the effect of a judgment against the entity at issue, while other cases focused on the "nature of the entity created by state law." *Id.* at 429. The Court singled out its recent decision in *Hess* and stated that, in light of that decision, "[o]f course, the question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued." *Id.* at 430. At the same time,

the Court noted that, although the question ultimately was one of federal law, "that federal question can be answered only after considering the provisions of state law that define the agency's character." *Id.* at 429 n 5.

Not surprisingly, the circuit courts have responded with a variety of different formulations of the appropriate factors to consider in determining whether an entity is an "arm of the state" for Eleventh Amendment purposes. The First Circuit, for example, has characterized the test as involving seven factors. *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F2d 1, 9 (1st Cir 1990). The Third Circuit employs a nine-factor test. *Blake v. Kline*, 612 F2d 718, 722-25 (3d Cir 1979), *cert den*, 447 US 921 (1980). The Seventh Circuit describes the test in terms of four factors. *Benning v. Board of Regents of Regency University*, 928 F2d 775, 777 (7th Cir 1991). The Ninth Circuit describes the test in terms of five factors. *Eaglesmith v. Ward*, 73 F3d 857 (9th Cir 1996). According to the Eleventh Circuit, the most important factor is the state court's characterization of the entity. *Tuveson v. Florida Governor's Council on Indian Affairs*, 734 F2d 730, 732 (11th Cir 1984). According to the Fifth Circuit, the most important factor is the vulnerability of the state treasury. *Hutsell v. Sayre*, 5 F3d 996, 999 (6th Cir 1993), *cert den*, 510 US 1119 (1994). Small wonder that, in the words of one commentator, the case law reflects "a highly technical, ad hoc approach, employing unintelligible factors." Alex E. Rogers, *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine*, 92 Colum L Rev 1243, 1243 (1992).

Notwithstanding the disarray, it seems fair to say that two principles are consistently at the forefront of Eleventh Amendment "arm-of-the-state" analysis.

First, the courts—in particular, the Supreme Court—nearly always emphasize the importance of the characterization of the entity as a matter of state law. As the Court noted in *Regents of the University of California*, although the scope of Eleventh Amendment immunity is a question of federal law, "that federal question can be answered only after considering the provisions of state law that define the agency's character." 519 US at 429 n 5.

Indeed, the Court's decision in *Mt. Health City School Dist. Bd. of Educ.* turned exclusively on the state law characterization of the board at issue. 429 US at 280. Similarly, in *Lake Country Estates, Inc.*, the Court placed heavy emphasis on the language of the state compact and on the intentions of the states that were signatories to it. 440 US 401-02. Placing such emphasis on the way in which the state itself characterizes the nature of the entity in question would seem to be consistent with principles of federalism and state sovereignty that the Court has identified as important underpinnings of the Eleventh Amendment. *See, e.g., Pennhurst State School & Hosp. v. Halderman*, 465 US 89, 106, 104 S Ct 900, 79 L Ed 2d 67 (1984) (discussing principles of federalism that underlie the Eleventh Amendment).

Second, courts—again, especially the Supreme Court—nearly always emphasize the importance of identifying whether the state treasury may be liable for the obligations of the entity at issue. Some lower courts even characterize that factor as the most significant. *See, e.g., Doe v. Lawrence Livermore National Laboratory*, 131 F3d 836, 839 (9th Cir 1997) ("[T]he element of State liability is the single most important factor in determining whether an entity is an arm of the state."). In *Hess*, the Supreme Court seemed to agree, explaining that, unless the state treasury would be vulnerable for the losses and debts of an entity, "the Eleventh Amendment's core concern is not implicated." 513 US at 51.

Other considerations have been mentioned, as well. As we have noted, some circuit courts describe the analysis in terms of as many as six, seven, or nine different factors. In our view, however, the additional factors generally reflect one of the two that, as we have noted, consistently drive the Supreme Court's analysis, and disaggregating our own analysis into further discrete terms does not appear to us to serve a useful purpose.[4]

---

[4] Among the additional factors that various circuit courts have mentioned as relevant are the manner in which state courts treat an entity, whether the entity exercises a significant degree of autonomy from the state, whether an agency can be sued in its own name, whether the entity has the right to hold and use property, the corporate status of the entity, and whether the entity performs an important governmental function. We discuss each of those factors in our analysis of how SAIF has been characterized under Oregon law.

### b. Application of the test

■     We pause to recap our analysis thus far. From our review of the United States Supreme Court's and other courts' opinions, it appears that whether defendants are "persons" within the meaning of section 1983 turns on whether they would be entitled to immunity under the Eleventh Amendment. Whether defendants would be entitled to immunity under the Eleventh Amendment, in turn, depends on a consideration of principally two factors, namely, whether defendants properly can be characterized as arms of the state under state law and whether the state treasury would be liable for their obligations. Because Rocklin, SAIF's president and chief executive officer, is named in her official capacity, she can claim immunity under the Eleventh Amendment only to the extent that SAIF could. We therefore turn to a determination of whether SAIF is an arm of the state for Eleventh Amendment purposes in light of the two principal considerations that we have described.

### (1)   State law characterization

In considering how state law characterizes SAIF for Eleventh Amendment purposes, we look to both the legislation by which the entity was created and the case law construing that legislation. That seems consistent with the United States Supreme Court's Eleventh Amendment analysis.[5]

SAIF's origins date back to the beginnings of workers' compensation legislation in Oregon, and its form and mission have been subject to a number of significant changes since then. Those changes, in turn, precipitated disputes and judicial decisions about its constitutional status—and, more importantly, its immunity. As a result, we must take some

---

[5] Actually, the Court has focused mostly on the legislation by which a challenged entity is created. *See, e.g.*, *Hess*, 513 US at 44-45; *Lake Country Estates, Inc.*, 440 US at 401-02; *Mt. Health City School Dist. Bd. of Educ.*, 429 US at 280. Judicial decisions appear to have had little to do with the Court's analysis. Still, in light of the fact that the proper focus is on the state law, and in light of the fact that—in this state, in particular—judicial construction of a statute stands on equal footing with the statute itself, *Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992) (Oregon Supreme Court construction of a statute becomes "a part of the statute as if written into it at the time of its enactment."), we think it is appropriate to consider judicial decisions as well.

time to describe those changes and the constitutional decisions that resulted. In brief, our examination of the evolution of SAIF and the legislation and judicial decisions concerning its status yields a mixed portrait. SAIF is an entity unique in Oregon law. It is a state agency for some purposes but not for others. It—or at least its predecessor—has been regarded as not subject to the immunity of the state. Yet it also has been characterized as a "public" corporation and an "instrument of the government" for other purposes.

### (a) A brief history of SAIF

Before workers' compensation legislation was enacted in 1913, state government had a limited role with respect to workplace safety and employer liability. In brief, under the 1910 Employers Liability Law, employers were subject to unlimited liability for certain negligent workplace injuries and deaths, subject to limited defenses. Lord's Oregon Laws, title XXXVII, ch IV, § 5057a, p xxxvi (Additions and Corrections) (1910). Employers were able to spread their risks only through the purchase of private casualty insurance.

In 1913, the legislature enacted the first of what ultimately would be many workers' compensation reforms.[6] Or Laws 1913, ch 112. The 1913 legislation fundamentally altered the relationship between workers, their employers, and the state. The new statutory regime consisted of a no-fault system under which employers would be subject to limited liability for work-related injuries. The new system was voluntary; employers that engaged in certain "hazardous occupations" were given the option of participating in the system, as were workers engaged in such occupations. *Id.* at §§ 10-18.[7]

The 1913 legislation established an "Industrial Accident Fund" (IAF) out of which workers received benefits for their work-related injuries. The IAF was initially capitalized with a $50,000 General Fund appropriation. *Id.* at § 20.

---

[6] After passage by the legislature, the bill was referred to the voters. In the November 1913 general election, the voters approved the measure.

[7] The provision permitting employees to opt into the new system was repealed in 1935. Or Laws 1935, ch 48.

Thereafter, employers who chose to participate in the new system paid a payroll assessment into the fund. The legislation established a three-person commission, the "State Industrial Accident Commission" (SIAC), to collect the assessments from participating employers, adjudicate claims, and pay benefits out of the IAF. *Id.* at §§ 2-9. The commissioners were appointed by the Governor and could be removed by the Governor for "inefficiency, neglect of duty or malfeasance in office." *Id.* at §§ 2-3. Decisions of the SIAC were reviewable by the circuit courts, and appeals therefrom were to the Supreme Court. *Id.* at § 32.

The issue of the constitutional status of the new SIAC first arose in a 1924 case, *Butterfield v. State Indus. Acc. Com.*, 111 Or 149, 223 P 941, *on reh'g*, 226 P 216 (1924). In that case, the claimant was the wife of a worker who had died as the result of an on-the-job injury. The SIAC disallowed her claim for benefits, and she appealed to the circuit court, as the new legislation permitted. The SIAC, however, did not appear in that appeal, and the circuit court reversed the SIAC's decision. At that point, the Attorney General attempted to appeal the reversal in the name of the State of Oregon. The claimant moved to dismiss the appeal on the ground that the SIAC had not taken any appeal. The Attorney General responded that the SIAC was an "arm of the state," and, as a result, the state was the real party in interest. From that premise, the Attorney General argued further that, because the state is immune from suit, so also was the SIAC. *Id.* at 152-53.

The Supreme Court rejected the argument that, as an "arm of the state," the SIAC was immune from suit. The court pointed to the portions of the reform legislation that expressly provided for judicial review of the SIAC's decisions. The court further noted that, although the IAF was held by the State Treasurer, payments from it could be drawn only upon vouchers transmitted by the SIAC. *Id.* at 153. On rehearing, the Attorney General insisted that the state's interest in the IAF necessarily meant that the SIAC, which administered that state fund, is an arm of the state and is immune from suit. The court disagreed, commenting broadly that "immunity does not obtain when an agency of the state is a party." *Id.* at 160.

In the following years, the workers' compensation statutes were amended in various ways not pertinent to this case. In the late 1920s, however, a dispute arose about whether the state had any continuing proprietary interest in the IAF.[8] The legislature responded by expressly disclaiming—in legalese that, fortunately, has fallen out of vogue—any interest in the fund:

> "The state of Oregon hereby does declare that the industrial accident fund created by the workmen's compensation act of Oregon, being chapter 112, General Laws of Oregon 1913, as amended by various sessions of the legislature thereafter, be and the same is a trust fund for the uses and purposes declared in said act and no other, and that the contributions to the said fund heretofore made by the state of Oregon have become an integral part of said fund * * *, and the state of Oregon hereby does declare that it has no proprietary interest in said fund or in the contributions thereto heretofore made by said state, and hereby does disclaim any right to reclaim said contributions or any part thereof for its own use, and hereby does waive any such right of reclamation, if any it ever had, in or to any of said fund."

Or Laws 1929, ch 172.

There followed some years after that a second challenge to the constitutional status of the SIAC, in *Bennett v. State Ind. Acc. Com.*, 203 Or 275, 281, 279 P2d 655, 279 P2d 886 (1955). In that case, the question was whether a lawyer who was also a member of the legislature could represent a party who was suing the SIAC. The Attorney General had complained that the lawyer who represented a claimant against the SIAC ran afoul of Article XV, section 7, of the Oregon Constitution, which prohibits any members of the legislative assembly from being engaged as counsel "in the prosecution of any claim against this state." The Attorney General argued that, because the SIAC was the state, the

---

[8] In 1927, the legislature attempted to borrow $600,000 from the IAF to build a state office building. Several employers and workers covered by the SIAC challenged the lawfulness of that loan. In *Eastern & Western Lumber Co. v. Patterson*, 124 Or 112, 258 P 193 (1927), *rev'd on reh'g*, 124 Or 146, 264 P 441 (1928), *aff'd*, 278 US 581, 49 S Ct 184, 73 L Ed 518 (1929), the Supreme Court concluded that the statute authorizing the loan was not unconstitutional.

lawyer-member's client's claim was a "claim against the state." *Bennett*, 203 Or at 277.

The Supreme Court began by noting that, under *Butterfield*, an action challenging a decision by the SIAC was not a suit against the state. The Attorney General apparently had suggested that, in light of the state's interest in the IAF at the time, *Butterfield* was incorrect in rejecting the argument that the SIAC was immune from suit. The court replied that, even if that were so, "the state's relationship to the fund has radically [been] altered" by the enactment of the legislature's express disclaimer of any interest in it:

> "If there is any reason for doubting the soundness of the statement in the Butterfield case that, in the then existing state of the law with respect to the interest of the State of Oregon in the State Industrial Accident Fund, an action against the commission was not an action against the state, that reason has been completely removed by the state's renunciation of any interest in the fund through the enactment of the law just referred to. It must be entirely clear today that no claim or judgment against the State Industrial Accident Commission can be paid out of any moneys belonging to the State of Oregon or affect an interest of value in a material sense to the state as a distinct entity. An action against the commission is in effect a proceeding to have a certain portion of a trust fund administrated by the commission but in which the state has no interest, appropriated to the satisfaction of an injured employee's claim for compensation under the provisions of the Workmen's Compensation Law. ORS 656.002 et seq. It is not an action against the state."

*Bennett*, 203 Or at 280-81.

The voluntary system created in 1913 continued until 1965. At that point, the state legislature had determined that, although the workers' compensation system had grown to include employees of a number of the state's largest employers, too many workers remained without coverage. Consequently, the legislature significantly overhauled the workers' compensation system and created an essentially mandatory system. Or Laws 1965, ch 285. Employers were

given the option of either contributing to the IAF or qualifying as a "direct responsibility employer," that is, demonstrating financial ability to provide coverage by either posting a bond or obtaining insurance from a private insurer. *Id.* at §§ 5, 74, 75. This became known as the "three-way" system.

The administration of the system—formerly the work of the SIAC—was divided between two newly created state agencies. First, the legislature allocated to the "Workmen's Compensation Board" the responsibility of adjudicating workers' claims. *Id.* at § 54. Second, the legislature created the "State Compensation Department"—shortly thereafter renamed the "State Accident Insurance Fund"— for the purpose of "transacting workmen's compensation insurance business." *Id.* at § 55.[9]

As the newly created entities began implementing the 1965 legislation, a fresh dispute arose about the management and ownership of the IAF. In *Sprague v. Straub*, 252 Or 507, 451 P2d 49 (1969), the court addressed the question whether money in the IAF could be invested in common stock without violating Article XI, section 6, of the Oregon Constitution, which provides that "[t]he state shall not subscribe to, or be interested in the stock of any company, association, or corporation." Citing *Butterfield* and *Bennett*, the court readily concluded that the constitutional prohibition did not apply to the IAF, because the state had no interest in the fund. *Sprague*, 252 Or at 519-21. The prohibition, the court commented, "appl[ies] only to funds owned by the state." *Id.* at 524.

Meanwhile, it did not take long for the new State Accident Insurance Fund to begin to complain about the difficulty of competing with private insurance carriers. In 1973, SAIF proposed a bill the effect of which, according to an Executive Department summary, would be to "divorce the State Accident Insurance Fund from state government controls." The 1973 bill died in committee. But the idea of making SAIF "independent" from state government did not.

---

[9] The name was changed by the 1969 Legislative Assembly. Or Laws 1969, ch 247.

In 1979, SAIF proposed Senate Bill (SB) 255, another effort to separate the state's workers' compensation insurance business from its regulatory role. This time, the proposal met with success and, as enacted, that legislation forms the statutory framework for the current workers' compensation system. SB 255 began by transforming the State Accident Insurance Fund into the "State Accident Insurance Fund Corporation" as "an independent public corporation." Or Laws 1979, ch 829, § 2.[10] The new independent public corporation was charged with the responsibility of "transacting

---

[10] The provisions of SB 255 that created the new independent public corporation and described its management structure were codified at ORS 656.751, which provides:

"(1) The State Accident Insurance Fund Corporation is created as an independent public corporation. The corporation shall be governed by a board of five directors appointed by the Governor. Two members shall be chosen to represent the public. Of the remaining three members, a board member must be insured by the State Accident Insurance Fund Corporation at the time of appointment and for one year prior to appointment, or an employee of such an employer. Members of the board are subject to confirmation by the Senate pursuant to section 4, Article III of the Oregon Constitution.

"(2) No member of the board of directors shall have any pecuniary interest, other than an incidental interest which is disclosed and made a matter of public record at the time of appointment to the board, in any corporation or other business entity doing business in the workers' compensation insurance industry.

"(3) The term of office of a member is four years, but a member serves at the pleasure of the Governor. Before the expiration of the term of a member, the Governor shall appoint a successor. A member is eligible for reappointment. If there is a vacancy for any cause, the Governor shall make an appointment to become immediately effective for the unexpired term.

"(4) A member of the board of directors is entitled to compensation and expenses as provided in ORS 292.495 [nonelective state officials].

"(5) The board of directors shall select one of its members as chairperson and another as vice chairperson, for such terms and with such duties and powers as the board of directors considers necessary for performance of the functions of those offices. A majority of the members of the board of directors constitutes a quorum for the transaction of business.

"(6) The board of directors shall meet at least once every three months at a time and place determined by the board of directors. The board of directors shall meet at such other times and places specified by the call of the chairperson or of a majority of the members of the board of directors.

"(7) It is the function of the board of directors to establish the policies for the operation of the State Accident Insurance Fund Corporation, consistent with all applicable provisions of law.

"(8) The board shall file with the Legislative Assembly and the Governor, not later than April 15 of each year, a report covering the activities and operations of the State Accident Insurance Fund Corporation for the preceding year."

workers' compensation insurance business formerly transacted by the State Industrial Accident Commission." *Id.* at § 5(1). The legislation authorized the new corporation to "insure a contributing employer against any liability such employer may have on account of bodily injury to his worker arising out of and in the course of employment, as fully as any private insurance carrier." *Id.* The new law authorized the corporation to "acquire, lease, rent, own and manage real property," as well as "construct, equip and furnish buildings or other structures as are necessary to accommodate its needs." *Id.* at § 5(5).[11] It also authorized the corporation to "contract with any state agency" to accomplish any of its functions that it deems appropriate. *Id.* at § 4.[12] The corporation is expressly made subject to local property taxation. *Id.* at § 5(6).[13]

---

[11] The provisions of SB 255 describing the purpose and functions of the new independent corporation were codified at ORS 656.752, which provides, in part:

"(1) The State Accident Insurance Fund Corporation is created for the purpose of transacting workers' compensation insurance and reinsurance business. The State Accident Insurance Fund Corporation also may insure an Oregon employer against any liability such employer may have on account of bodily injury to a worker of the employer arising out of and in the course of employment as fully as any private insurance carrier.

"(2) The functions of the State Accident Insurance Fund Corporation shall be:

"(a) To confer with and solicit employers and to determine, handle, audit and enforce collection of premiums, assessments and fees of insured employers insured with the State Accident Insurance Fund Corporation.

"(b) To make insurance available to as many Oregon employers as may be consistent with the overall integrity of the Industrial Accident Fund, in accordance with ORS 656.634 and sound principles of insurance.

"(c) To receive and handle and process the claims of workers and beneficiaries of workers injured in the employ of insured employers insured with the State Accident Insurance Fund Corporation; and

"(d) To perform all other functions which the laws of this state specifically authorize or which are necessary or appropriate to carry out the functions expressly authorized."

[12] That provision is now codified at ORS 656.753, and provides, in part, that,

"[i]n carrying out the duties, functions and powers imposed by law upon the State Accident Insurance Fund Corporation, the board of directors or manager of the State Accident Insurance Fund Corporation may contract with any state agency for the performance of such duties, functions and powers as the corporation considers appropriate."

[13] The provision was codified at ORS 656.752(6).

The new independent corporation was to be governed by a board of directors appointed by the Governor and subject to confirmation by the Senate. *Id.* at § 2. The corporation was expressly exempted from a variety of statutes that apply to state agencies. *Id.* at § 4. Specifically, the new corporation was exempted from the State Personnel Relations Law, ORS chapter 240; public contracts and purchasing statutes, ORS chapter 279; state printing statutes, ORS chapter 282; interagency services statutes, ORS chapter 283; state financial administration statutes, ORS chapter 291; and statutes governing the administration of public funds, ORS chapter 293.[14] And, interestingly, the new legislation authorized Legislative Counsel "to substitute, for words designating the State Accident Insurance Fund as an agency, words designating the State Accident Insurance Fund *Corporation.*" Or Laws 1979, ch 829, § 8 (emphasis added).[15]

SAIF's manager explained the purpose of SB 255 in the following terms:

"Senate Bill 255 is designed to lower the cost of workers' compensation in Oregon by improving the ability of the state's largest carrier—the State Accident Insurance Fund—to respond to the needs of its policyholders and their workers.

"This legislation recognizes that SAIF is not a state agency in the true sense, but a self-supporting, non-profit insurance fund operating within Oregon's competitive three-way workers' compensation system. SAIF was created by the Legislature to provide the best workers' compensation protection at the lowest possible cost. Senate Bill 255 will further assist SAIF in meeting that obligation.

"This bill would establish SAIF as a public corporation under the direction of a five-member Board of Directors. The members of that Board would come from the ranks of SAIF policyholders or the employe[e]s of those policyholders. They would be appointed by the Governor and subject to confirmation by the Senate.

---

[14] Those exemptions were codified at ORS 656.753.

[15] That particular provision was not codified in the Oregon Revised Statutes.

"Under the direction of this five-member Board, the State Accident Insurance Fund Corporation would continue to operate in a self-supporting, non-profit manner.

"Its employees would continue to be 'public' employe[e]s, although not 'state' employe[e]s as defined under the State Merit System Law.

"SAIF would continue to compete directly with private insurance carriers for a share of the market, but would be responsible for obtaining all support services presently provided it as a state agency.

"SAIF's operations would continue to be audited by the Secretary of State, as well as the Oregon Insurance Commissioner. In addition, an annual report of operations would be filed with the legislative assembly and the Governor. Finally, as a creature of statute, it would continue to be under the ultimate control of the legislature.

"The major change would come with SAIF's ability to more quickly respond to the needs of injured workers and their employers in such critical cost control areas as industrial hygiene, safety consultation and claims management. To use those premiums paid by its policyholders more effectively as a means of lowering their overall compensation costs.

"In short—to be less bureaucratic and more responsive."

Testimony, House Labor Committee, SB 255, June 6, 1979, Ex A (statement of Charles Gill).

A representative of the Governor, Jim Russell, offered a similar explanation as to the purpose of the bill, that is, "to break SAIF out from various constraints that exist and let it be competitive." Minutes, House Labor Committee, SB 255, June 11, 1979, 3 (statement of Jim Russell). He said that the bill was intended "to recognize that SAIF is unique from most other agencies in the state and should be able to compete in the marketplace." *Id.*

At the same time, some members of the legislature expressed doubts about SAIF's new corporate status. Then-Senator Kulongoski, for example, complained that it appeared that, under SB 255, SAIF would essentially become a private insurance carrier in the guise of a public entity.

Minutes, Senate Committee on Labor, Consumer and Business Affairs, SB 255, Feb 2, 1979, 6. Others questioned whether the bill would eliminate government oversight of SAIF's operations. *Id.* One of the bill's proponents responded—somewhat vaguely—with assurances either that the market itself would replace legislative control, *see, e.g.*, Minutes, Senate Committee on Labor, Consumer and Business Affairs, SB 255, Feb 2, 1979, 6 (statement of Charles Gill), or that the bill merely streamlined SAIF's operations, but did not alter its basic structure, *see, e.g.*, Minutes, Senate Committee on Labor, Consumer and Business Affairs, SB 255, Feb 2, 1979, 7-8 (statement of Charles Gill).

The ambiguous nature of the new SAIF Corporation was bound to have significant legal consequences. And it did not take long for those consequences to surface. In 1982, the legislature faced a significant budget shortfall occasioned by a recession-produced drop in state revenues. During a third special session, the legislature determined that the Industrial Accident Fund contained a "surplus" of over $168 million. The legislature directed the state Department of Justice to draft legislation to "transfer" $81 million of that surplus from the IAF to the state's general fund for the purpose of balancing the state budget. A significant hurdle to that charge, of course, was the fact that the legislature back in 1929 had disclaimed any interest in the IAF.

In the end, the department drafted, and the legislature enacted, legislation that authorized the legislature to dispose of a "surplus" in the IAF as it deems appropriate and simultaneously directed the state treasurer to deposit $81 million from the IAF into the general fund.[16] That legislation became known as the "Transfer Act." The authorization portion of the act was phrased as a qualification to the state's disclaimer of interest in the IAF, so that the statute, as

---

[16] Interestingly, there was sufficient ambiguity about the legal status of SAIF and the IAF that the Department of Justice prepared two different bills, one assuming that SAIF was a state agency and the other assuming that it was not. In the end, the legislature adopted *both*, that is, it adopted the former and, as a backup, adopted the latter in the event that the former was declared unconstitutional. As it turned out, the first of the two bills was not declared unconstitutional in the litigation that resulted.

amended, declares that the state has no interest in the IAF, subject to the state's authority

> "to direct legislatively the disposition of any surplus in excess of reserves and surplus deemed actuarially necessary according to recognized insurance principles, and necessary in addition thereto to assure continued fiscal soundness of the State Accident Insurance Fund Corporation both for current operations and for future capital needs[.]"

The transfer portion of the Transfer Act provided:

> "(1) Notwithstanding any other statute, the State Accident Insurance Fund Corporation shall reduce its excess surplus in the Industrial Accident Fund by the amount of $81 million in the manner provided in this Act.

> "(2) Notwithstanding ORS 293.115(2), or any other provision of law, the State Treasurer shall transfer $81 million from the Industrial Accident Fund into the General Fund on June 30, 1983. Any liquidation of investments necessary to accomplish this transfer shall be done in an orderly manner and at the most advantageous terms obtainable."

Not surprisingly, that legislative action precipitated litigation. In one of several cases that resulted, *Frohnmayer v. SAIF*, 294 Or 570, 660 P2d 1061 (1983), SAIF itself authorized counsel other than the Attorney General to file suit to challenge the validity of the Transfer Act. The Attorney General responded by, among other things, filing a declaratory judgment action raising the question whether SAIF was authorized to retain outside counsel and institute legal proceedings without his approval. According to the Attorney General, under ORS 180.220, the state Department of Justice—headed by the Attorney General—has the exclusive control of state litigation and no "state officer, board, commission, or the head of a department or institution of the state" is permitted to retain counsel other than counsel provided by the Department of Justice. SAIF responded that it is not subject to the provisions of that statute because, among other things, as a public corporation, it is not among the state officers, boards, and commissions that are subject to the limitations of that statute. *Frohnmayer*, 294 Or at 573, 575.

The Supreme Court rejected SAIF's contention. The court reviewed the 1979 law by which SAIF was transformed into an "independent public corporation," remarking that it was not clear precisely what the legislature intended by that legislation. *Id.* at 579 ("The legislative history is extremely vague as to why an 'independent public corporation' was created."). What was clear, the court held, was that, in that 1979 law, the legislature expressly exempted SAIF from a number of statutes that apply to state agencies, and ORS 180.220 was not among them. *Id.* The court acknowledged that ORS 180.220 referred to state "officers," "boards," and heads of "departments" or "institutions of the state," without including in the list any "public independent corporations." The court nonetheless concluded that the statutory terms "were not intended to be by way of limitation, but by way of description, to generally describe the activities of the entity 'the State of Oregon.' " *Id.* at 577. Although the court never actually closed the argument loop by stating explicitly that SAIF, even as an "independent public corporation," remained a part of "the State of Oregon," that necessarily was the implication of the court's decision.[17]

In *Eckles v. State of Oregon*, 306 Or 380, 760 P2d 846 (1988), the validity of the Transfer Act itself was in issue. The plaintiff, an employer insured by SAIF, argued that the Transfer Act was unlawful on a variety of grounds, including that the act violated the equal privileges or immunities provision of Article I, section 20, of the Oregon Constitution, and that it amounted to an unlawful impairment of contract, in violation of Article I, section 21.

The plaintiff's Article I, section 20, argument was that SAIF's insureds were being treated differently from employers that obtained insurance from private carriers. The court gave the argument short shrift. SAIF, the court explained, "as a state entity, is not a 'citizen' to which Section 20 could apply, and, in any event, the putative classes of

---

[17] In fact, the sequence of the court's opinion was somewhat circular, in that, after concluding that ORS 180.220 applied to "the State of Oregon," the court returned to the 1979 legislation and the fact that it did not exempt SAIF from ORS chapter 180. *Frohnmayer*, 294 Or at 577-80. Nevertheless, as we have noted, the upshot of the court's decision is unmistakable.

insureds exist only by virtue of the workers' compensation statutes and are thus not cognizable." *Eckles*, 306 Or at 387.

The plaintiff's Article I, section 21, argument was that the legislature's 1929 disclaimer of any interest in the IAF, codified at ORS 656.634, in effect, was part of his contract of insurance with SAIF. As a result, he argued, the Transfer Act, which expressly abrogated that disclaimer, unconstitutionally impaired his contract with SAIF. *Id.* at 388. The Supreme Court agreed with that argument, but only in part. First, the court noted that, "[i]f the Transfer Act impaired a contractual obligation stated in ORS 656.634, the Act impaired an obligation of the state rather than an obligation of SAIF." *Id.* at 389. In other words, as relating to the IAF, plaintiff's contract was with the State of Oregon, not with SAIF. That said, the court went on to hold that the portion of the Transfer Act declaring the legislature's authority to transfer any IAF surplus amounted to an unconstitutional impairment of contract "as it affects employers with SAIF insurance contracts entered into before the enactment of the Transfer Act." *Id.* at 399. As to all others, however, the statute merely redefined the nature of the state's contractual obligation. *Id.* As for the portion of the Transfer Act actually transferring money out of the IAF, however, the court concluded that the legislature had not acted in violation of the constitution. It had merely breached its contract and, in consequence, would be liable for damages for that breach. *Id.* at 401.

Meanwhile, litigation also ensued concerning the lawfulness of the 1979 legislation that created the new "independent public corporation." In *State ex rel Eckles v. Woolley*, 302 Or 37, 726 P2d 918 (1986) (*Woolley*), the plaintiff argued that, in creating an "independent public corporation," the legislature had run afoul of the constitutional limitation of Article XI, section 2, that "[c]orporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws." According to the plaintiff, the legislature itself called SAIF a "corporation," and the courts "should take the legislature at its word." *Id.* at 45. The respondents, SAIF's directors, argued that SAIF was not the sort of corporation to which Article XI, section 2, applied. *Id.* at 45-46.

The court agreed with SAIF's directors. Justice Linde, writing for the court, began by noting that arguments based on the particular label that courts may have employed when referring to public, "quasi-public," and other entities are not usually helpful. What matters, the justice cautioned, is the particular context in which the labels are used: "[C]haracterizations in judicial opinions responding to such arguments made in one context are inconclusive on substantially different issues arising in the context of different laws." *Id.* at 45.

Quoting an earlier opinion, *Cook v. Port of Portland*, 20 Or 580, 583, 27 P 263 (1891), the court then explained that the prohibition that is stated in Article XI, section 2, is not implicated when the legislature creates a corporation for a public purpose, and the corporation is "an instrument of the government with certain delegated powers, subject to the control of the legislature." *Woolley*, 302 Or at 47 (internal quotation marks omitted). Turning to SAIF, the court summarily concluded that, although a "corporation," SAIF is the public variety to which the prohibition in Article XI, section 2, does not apply. *Id.* at 48-49.

(b)  Implications

One thing—and, perhaps, one thing only—is clear from the foregoing summary of the legislative and judicial history of SAIF: This state's law has characterized SAIF's nature and status in a variety of different ways. In its early form, when, as the SIAC, it was much more obviously in the nature of a traditional state agency, the Oregon Supreme Court declared that it was not an arm of the state entitled to immunity from suit. *Butterfield*, 111 Or at 152-53. A suit against the SIAC, the court held, was not a suit "against the state." *Id.* That conclusion was reaffirmed some years later in even more categorical terms after the legislature disclaimed any interest in the IAF. *Bennett*, 203 Or at 280-81.

The 1979 legislation that altered the entity's name and structure and expressly exempted it from a variety of laws that apply to state agencies suggests that the legislature intended SAIF to have a business purpose and function apart from traditional governmental business and to have

political and fiscal independence. Certainly, the chief supporters of the legislation characterized the legislation as recognizing "that SAIF is not a state agency in the true sense, but a self-supporting, nonprofit insurance fund." Testimony, House Labor Committee, SB 255, June 6, 1979, Ex A (statement of Charles Gill). Some provisions in the new law appear expressly to assume that SAIF is an entity distinct and apart from the state. As we have noted, for example, what is now ORS 656.753 authorizes SAIF to "contract with any state agency," implying that SAIF is not simply *another* state agency. Even more to the point is the uncodified portion of the 1979 legislation that authorizes the Legislative Counsel to substitute the words "State Accident Insurance Fund Corporation" for existing references in the Oregon Revised Statutes to SAIF as "an agency." Or Laws 1979, ch 829, § 8.

Some decisions of the Supreme Court following the enactment of the 1979 law contain characterizations of SAIF in very different terms, however. In *Frohnmayer*, the court essentially assumed that SAIF remained a part of the state, certainly for the purposes of the applicability of ORS chapter 180. 294 Or at 572. Similarly, in *Eckles*, the court referred to SAIF as "a state entity." 306 Or at 387. And, in *Woolley*, the court referred to the independent public corporation as an "instrumentality of the government." 302 Or at 48-49.

Yet even those cases reveal a tendency of the court to treat SAIF as the state for some purposes, but not for others. In *Eckles*, for example, the court concluded that, for purposes of Article I, section 20, SAIF is "a state entity." 306 Or at 387. Later in the opinion, however, the court concluded that, for purposes of Article I, section 21, a contract with SAIF is not a contract with the state. *Id.* at 389.

Perhaps the best approach at this juncture is to recall Justice Linde's caution in *Woolley* that judicial characterizations of an entity "made in one context are inconclusive on substantially different issues arising in the context of different laws." *Woolley*, 302 Or at 45. In a similar vein, we recall the conclusion of the United States Supreme Court in *Regents of the University of California* that not every state entity is an "arm of the state" for purposes of the Eleventh Amendment. 519 US at 429-30.

In that regard, it bears noting that none of the cases that we have mentioned addressed the issue of SAIF's immunity under the Eleventh Amendment. Each involved a different legal issue, and, in each, SAIF's status had different legal significance. In no Oregon case has a court held that SAIF is an arm of the state for purposes of Eleventh Amendment immunity. To the contrary, and in summary, what the foregoing account demonstrates is that for some purposes SAIF is treated as an arm of the state, and for some purposes it is not.

(2)    The vulnerability of the state treasury

We turn, then, to the second of the two most important considerations in evaluating whether an entity is clothed in Eleventh Amendment immunity, that is, the vulnerability of the state treasury. As we have noted, the Supreme Court has explained that the consideration is especially important, because the potential liability of the state treasury is a "core concern" of the framers in adopting the Eleventh Amendment. *Hess*, 513 US at 51.

Whether the Oregon state treasury is liable for the debts and obligations of SAIF is readily answered: It is not. SAIF is fiscally independent of the state. Its operational funding source is the IAF, not the general fund. The IAF, as we have described, is funded by employer premium payments. And all benefits to workers, as well as SAIF's own expenses, are paid from the IAF. ORS 656.632.

It is true, as we have noted, that many years ago the state contributed to the IAF. But it is also true that the state legislature has since then disclaimed any "proprietary interest in the Industrial Accident Fund or in the contributions made to the fund by the state prior to June 4, 1929." ORS 656.634(2). The Oregon Supreme Court described the effect of that legislation in categorical terms: "It must be entirely clear today that no claim or judgment against the State Industrial Accident Commission can be paid out of any moneys belonging to the State of Oregon or affect 'an interest of value in a material sense to the state as a distinct entity.' " *Bennett*, 203 Or at 280.

Since then, the legislature has added to that disclaimer a qualification that the state retains the right to

direct the disposition of any surplus in excess of the reserves in the IAF and to take other action necessary "to assure continued fiscal soundness" of SAIF. ORS 656.643. That qualification does not *obligate* the state to do anything, however. Certainly it does not, by its terms, make the state involuntarily liable for the debts and obligations of SAIF. Nor have we identified any other statute that does so.

### (3)   Synthesis

Our Eleventh Amendment analysis yields the following conclusions. First, as to the state law characterization of the entity at issue, there simply is no consistent characterization. As we have noted, over the years and in different contexts, SAIF and its predecessors have been variously characterized as an arm of the state and as independent of the state. Thus, our analysis of that consideration does not strongly weigh either for or against Eleventh Amendment immunity. Second, as to the vulnerability of the state treasury, the answer is much clearer. The state treasury is not liable for the debts and obligations of SAIF. Especially in light of the United States Supreme Court's emphasis on that factor as a "core concern" of the framers in adopting the Eleventh Amendment, *Hess*, 513 US at 51, we conclude that that factor weighs heavily against Eleventh Amendment immunity and, in the end, is dispositive. SAIF is not entitled to Eleventh Amendment immunity and, in consequence, is a "person" subject to suit under 42 USC section 1983. Because Rocklin is named in her official capacity, it necessarily follows that she is not entitled to Eleventh Amendment immunity either and therefore is a "person" subject to suit under section 1983.

■    SAIF insists that such a conclusion is contrary to a decision of the United States District Court for the District of Oregon, and that is true. In *Forster v. SAIF Corporation*, 23 F Supp 2d 1196 (D Or 1998), the court concluded that SAIF is not a "person" within the meaning of section 1983. Such decisions of the lower federal courts certainly are entitled to careful consideration. Still, they are in no way binding on us and are to be given such weight as their own persuasive force requires. *Gillar v. Employment Div.*, 300 Or 672, 676 n 6, 717 P2d 131 (1986) (acknowledging that, when Oregon courts

interpret federal law, only decisions of the United States Supreme Court are binding).

In this case, we find the district court's opinion unpersuasive. The opinion rests solely on brief references to the Oregon Supreme Court's opinions in *Frohnmayer* and *Eckles*, in which the state court referred to SAIF as an entity of the state. *Forster*, 23 F Supp at 1197. The court did not identify or apply the relevant Eleventh Amendment analysis that we have described. In particular, the court did not address whether the state treasury would be vulnerable for the debts and obligations of SAIF.[18] We adhere to our conclusion that SAIF and Rocklin are "persons" within the meaning of section 1983.

## 2. Did defendants act under color of state law?

■        Section 1983 applies, as we have noted earlier in this opinion, only when a "person" acts "under color of state law" to deprive a person of certain rights, privileges, or immunities. In this case, the trial court concluded both that defendants are not "persons" within the meaning of the statute and that they did not act "under color of state law." Thus, our determination that the trial court erred with respect to the first conclusion is not dispositive. We must determine whether it was incorrect with respect to the second conclusion as well.

Plaintiff argues that the court erred because, even though it is not an arm of the state for Eleventh Amendment purposes, SAIF still acted in this case as a government-controlled entity for public purposes. In making that argument, plaintiff heavily relies on the United States Supreme Court's decision in *Lebron v. National Railroad Passenger Corporation*, 513 US 374, 378, 115 S Ct 961, 130 L Ed 2d 902 (1995), in which the Court held that, although AMTRAK was

---

[18] Defendants also rely on—indeed, quote—a decision of the Court of Appeals for the Ninth Circuit, *Sauerbrey v. Kulongoski*, 921 F2d 281 (9th Cir 1990). What defendants did not disclose or discuss, however, is the fact that the brief opinion was unpublished. Under the rules of the Ninth Circuit, such opinions should not be cited except in circumstances not pertinent to this case. Ninth Circuit Rule 36-3. *See In re Davenport*, 335 Or 67, 70, 57 P3d 897 (2002) ("as a matter of comity," Oregon courts will refrain from citing unpublished Ninth Circuit decisions).

not entitled to Eleventh Amendment immunity, it neverthe-less engaged in "state action" when it prohibited certain bill-board displays at a railway station.

Defendants, for their part, adopt an interesting—and, frankly, troubling—tactic in response. In a footnote in their brief on appeal, they purport to agree with the trial court's conclusion that they did not act "under color of state law." At the same time, however, they decline to offer any briefing on the issue, because, in their view, the court's deci-sion that they are not "persons" within the meaning of section 1983 is "more straightforward" and "dispositive." Parties, of course, are free to choose to brief and argue cases as they think best. But—let us be clear—if they choose not to provide assistance on a given issue, they will stand on thin ice if they choose later to complain to us about a decision that is not to their liking.

■ That said, we turn to whether plaintiff is correct in contending that defendants acted "under color of state law." The classic formulation of the requirement—forgive the pun—was stated in *United States v. Classic*, 313 US 299, 326, 61 S Ct 1031, 85 L Ed 2d 1368 (1941): "Misuse of power, pos-sessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.'" *See also West v. Atkins*, 487 US 42, 49, 108 S Ct 2250, 101 L Ed 2d 40 (1988) (same). The requirement that defendants have acted "under color of state law" frequently is not distinguished from the Fourteenth Amendment requirement of "state action," so fre-quently, in fact, that federal courts tend to employ the con-cepts interchangeably. As the Supreme Court observed in *Lugar v. Edmondson Oil Co.*, 457 US 922, 928, 102 S Ct 2744, 73 L Ed 2d 482 (1982):

> "[T]he two concepts cannot so easily be disentangled. Whether they are identical or not, the state-action and the under-the-color-of-state-law requirements are obviously related. Indeed, until recently this Court did not distin-guish between the two requirements at all.
>
> "In *United States v. Price*, [383 US 787, 794 n 7, 86 S Ct 1152, 16 L Ed 2d 267 (1966),] we explicitly stated that the requirements were identical: 'In cases under § 1983, "under

color" of law has consistently been treated as the same thing as the "state action" required under the Fourteenth Amendment.' * * *

"Similarly, it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."

(Footnotes omitted.) *See also Brentwood Academy v. Tennessee Secondary School Athletic*, 531 US 288, 295 n 2, 121 S Ct 924, 148 L Ed 2d 807 (2001) ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for section 1983 purposes.").

In that light, plaintiff's reliance on *Lebron*—a "state action" case—makes sense. In that case, as we have noted, the Court addressed whether AMTRAK engaged in state action when it prevented an individual from posting certain billboards at a train station. The Court determined that, although AMTRAK was not an agency of the government for Eleventh Amendment immunity purposes, it remained sufficiently governmental in nature to satisfy the state action requirement. Among other things, the Court noted that the entity was created by the government, subject to governmental control, and operated for government purposes. *Lebron*, 513 US at 397.

The same can be said of SAIF. It is a creature of the state legislature. It has no private stockholders. Its directors are appointed by the governor, subject to confirmation by the Senate. It is required to submit reports to the legislature. And it operates for what the Oregon courts have repeatedly characterized as a public purpose. *See, e.g., Eckles*, 306 Or at 387 (SAIF is a "state entity" and not a "citizen" for Article I, section 20, purposes); *Woolley*, 302 Or at 37 (reasoning that SAIF is not subject to prohibition of Article XI, section 2, because it is a "public" corporation). Thus, although SAIF— like AMTRAK—is not subject to Eleventh Amendment immunity, it is—also like AMTRAK—nevertheless sufficiently tied to the state that its actions constitute "state action" for the purposes of satisfying the requirements of section 1983. *See also Pennsylvania v. Board of Directors of City*

*Trusts of the City of Philadelphia*, 353 US 230, 77 S Ct 806, 1 L Ed 2d 792 (1957) (college built and maintained pursuant to a private trust was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees).

### 3. *Is plaintiff's due process claim barred by claim preclusion?*

■   Our determination that the trial court erred in concluding that defendants were not "persons" within the meaning of section 1983 and that they did not act "under color of state law" does not yet establish that the court erred in entering summary judgment in favor of defendants. As we noted earlier in this opinion, the trial court also stated that its decision was grounded independently on defendants' contention that plaintiff's due process claim was barred by claim preclusion. The court accepted defendants' argument that, because plaintiff could have raised his due process claim in the administrative proceeding on the termination of his PTD benefits before the ALJ and the Workers' Compensation Board—but did not do so—he cannot now raise the issue in this proceeding.

On appeal, plaintiff argues that the trial court erred in reaching that conclusion. According to plaintiff, neither the ALJ nor the Workers' Compensation Board could have afforded him the relief that is available under section 1983, specifically, damages. In that regard, plaintiff notes that he alleged that, among other things, because of his financial dependence on his PTD benefits, the termination of those benefits damaged him in a way that could not be recompensed by merely restoring the benefits themselves. In addition, plaintiff argues, those administrative agencies lacked authority to grant him the injunctive relief that he requested.

Defendants do not contest that the administrative agencies that evaluated the termination of plaintiff's PTD benefits lacked authority to dispose of his federal claims, but they insist that, because those agencies still could have ruled on the constitutional *issue* that plaintiff now raises, his entire claim is barred by the doctrine of claim preclusion.

The Oregon Supreme Court has described the doctrine of claim preclusion in the following terms:

" '[A] plaintiff who has prosecuted one action against a defendant through to a final judgment * * * is barred[, *i.e.*, precluded] * * * from prosecuting another *action against* the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action.' "

*Drews v. EBI Companies*, 310 Or 134, 140, 795 P2d 531 (1990) (quoting *Rennie v. Freeway Transport*, 294 Or 319, 323, 656 P2d 919 (1982)). Thus, the proper focus is whether a *claim* could have been joined in the earlier action, not whether a particular legal *issue* could have been raised.

In any event, it is not clear to us that the issue in this case—the constitutionality of termination of PTD benefits without a pretermination hearing—was even relevant to any of the issues before the agencies that were charged with examining whether SAIF had properly determined that plaintiff is no longer capable of gainful and suitable employment. OAR 436-030-0055. Certainly administrative agencies—and, more specifically, the hearings division of the Workers' Compensation Board—have authority to determine the constitutionality of their own proceedings. *See, e.g., Koskela v. Willamette Industries, Inc.*, 331 Or 362, 382, 15 P3d 548 (2000) (reviewing Workers' Compensation Board's decision as to the constitutionality of hearings division proceedings evaluating whether, in the first instance, the claimant was entitled to PTD benefits). But, in this case, the constitutionality of the hearings division proceedings themselves was not in dispute. Instead, the issue that plaintiff now raises concerns the constitutionality of the process by which SAIF determined that he was no longer entitled to PTD benefits *before* any of the hearings division proceedings even commenced.

Aside from that, the due process claim that plaintiff now asserts could not "have been joined in the first action." *Drews*, 310 Or at 140. Plaintiff's claim for a deprivation of his constitutional rights could not have been asserted before the

hearings division. The hearings division has no authority to make any determination of civil liability, nor does it have the authority to award damages—including noneconomic damages—or injunctive relief. *Cf. Nutbrown v. Munn*, 311 Or 328, 345, 811 P2d 131 (1991) (although state administrative agencies do not have authority to award damages under section 1983, it was appropriate to require the plaintiffs to exhaust state administrative remedies before pursuing their civil rights claim when an agency did have authority to afford them, in the administrative proceeding, all the relief that they request in the civil rights claim). We conclude that plaintiff's due process claim is not barred by the doctrine of claim preclusion.

### 4. *Is the claim for injunctive relief moot?*

■      There remains one final issue for us to address, namely, whether the claim for injunctive relief is moot in light of the fact that plaintiff already has obtained a full-blown evidentiary hearing, precisely the injunctive relief that he requests in his section 1983 due process claim. The trial court concluded that the issue had become moot. On appeal, plaintiff contends that the trial court erred because, although perhaps otherwise moot, the claim remains subject to the exception for cases that are "capable of repetition, yet evading review." Defendants respond that the Oregon courts do not recognize that exception to the general rule that moot cases are nonjusticiable. They further respond that even federal courts recognize the exception only when a party shows that the same claim involving the same parties is likely to arise again. In this case, defendants argue, plaintiff has failed to make such a showing.

■■      We agree with defendants. In Oregon, the courts do not recognize the doctrine that a claim is not moot if capable of repetition, yet evading review. *Yancy v. Shatzer*, 337 Or 345, 363, 97 P3d 1161 (2004). Federal courts do recognize the doctrine, but only when there is a showing of a reasonable likelihood that the same claim involving the same parties will arise again. *See, e.g., Lewis v. Continental Bank Corp.*, 494 US 472, 481, 110 S Ct 1249, 108 L Ed 2d 400 (1990). In this case, plaintiff has not made that showing. His challenge to the termination of his PTD was rejected by the ALJ and

the Workers' Compensation Board, and we affirmed. In the meantime, plaintiff has not established that the issue is likely to arise again as between him and SAIF. We thus agree with the trial court's dismissal of the claim for injunctive relief on grounds of mootness.

B.  *Plaintiff's due process claim*

Plaintiff argues that, should we determine that the trial court erred in dismissing his claim for damages under section 1983, we should proceed with an assessment of the claim on the merits and reverse the trial court's denial of his cross-motion for summary judgment. The trial court, however, never reached the merits of plaintiff's claim. It expressly dismissed the action on grounds other than the merits without reaching the question whether plaintiff had been denied due process. We therefore have no ruling on that question to review. *See Anderson v. Carden*, 146 Or App 675, 689, 934 P2d 562 (1997) (declining to address on appeal whether summary judgment was proper on an alternative ground when trial court expressly refrained from considering the alternative ground).

Judgment dismissing claim for injunctive relief affirmed; otherwise reversed and remanded.