Argued and submitted January 9, decision of Court of Appeals affirmed;
judgment of circuit court affirmed in part and reversed in part, and case
remanded for further proceedings July 26, 2007

John JOHNSON,
individually and for all others similarly situated,
*Respondent on Review,*

*v.*

SAIF CORPORATION,
an Oregon public corporation,
and Brenda Rocklin,
*Petitioners on Review.*

(CC 020707157; CA A123541; SC S53734)

164 P3d 278

See also 200 Or App 414, 115 P3d 988.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioners on review. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Meagan A. Flynn, of Preston Bunnell & Flynn LLP, Portland, argued the cause and filed the briefs for respondent on review.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Kistler, and Walters, Justices.**

BALMER, J.

---

** Linder, J., did not participate in the consideration or decision of this case.

**BALMER, J.**

The central issue before us in this case is whether the State Accident Insurance Fund Corporation (SAIF) may be sued for damages under 42 USC section 1983. Plaintiff filed a Section 1983 action seeking damages and injunctive relief against SAIF and its president and chief executive officer (collectively, SAIF or defendant).[1] Plaintiff alleged that SAIF had deprived him of his right to due process under the Fourteenth Amendment to the United States Constitution when SAIF terminated his permanent total disability (PTD) workers' compensation benefits without a pretermination hearing. The trial court granted summary judgment in favor of defendants. The Court of Appeals affirmed the trial court's dismissal of plaintiff's claim for injunctive relief, but otherwise reversed and remanded, holding that SAIF is a "person" for purposes of Section 1983 and therefore could be sued for its alleged violation of plaintiff's due process rights. *Johnson v. SAIF*, 202 Or App 264, 122 P3d 66 (2005) (*Johnson I*), adh'd to on recons, 205 Or App 41, 132 P3d 1058 (2006) (*Johnson II*). We allowed SAIF's petition for review and, for the reasons set out below, affirm the decision of the Court of Appeals.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 1989, the Workers' Compensation Board (board) ordered SAIF to pay plaintiff PTD benefits as a result of a 1981 workplace injury. SAIF conducted periodic reviews of plaintiff's condition, as required by law. ORS 656.206(5).[2] At SAIF's request, several doctors examined plaintiff in January 2001. In June 2001, SAIF informed plaintiff that it was reevaluating his PTD benefits, but it did not seek from

---

[1] Plaintiff sued SAIF and Katherine Keene, SAIF's president and CEO at the time of the events alleged in the complaint. Subsequently, Cecil Tibbetts and, later, Brenda Rocklin, assumed those positions and were substituted as defendants. Because the allegations as to Rocklin, like those as to her predecessors, are identical to the allegations respecting SAIF as an entity, we do not analyze the claims against her separately from those against SAIF.

[2] ORS 656.206(5), and several of the other statutes cited in this opinion, have been amended since the relevant events in this action occurred. The operative text of the current provisions, however, are substantively the same as the 1999 version of the statutes in effect at the time of the events at issue. For that reason, we refer to the current version of those statutes.

plaintiff, nor did plaintiff provide, any additional information concerning his physical condition. In September 2001, SAIF notified plaintiff that it had determined that he no longer was entitled to PTD benefits and that he was entitled to only permanent partial disability (PPD) benefits, which were smaller in amount than plaintiff's PTD benefits. No statute or rule required a hearing before SAIF terminated plaintiff's PTD benefits and, following its determination that plaintiff was entitled to only PPD benefits, SAIF paid plaintiff PPD benefits rather than the higher PTD benefits.

Administrative rules entitled plaintiff to an evidentiary hearing on SAIF's determination before the hearings division of the board. OAR 436-030-0065(6). Plaintiff requested a hearing, and, in October 2002, an administrative law judge (ALJ) conducted an evidentiary hearing to review SAIF's determination. At the hearing, plaintiff had the opportunity to contest SAIF's evidence and present his own evidence. In May 2003, the ALJ affirmed SAIF's determination. The board affirmed the opinion and order of the ALJ, and the Court of Appeals affirmed the board's decision without opinion. *Johnson v. SAIF*, 200 Or App 414, 115 P3d 988 (2005).

In addition to appealing SAIF's September 2001 determination, plaintiff filed this Section 1983 action against SAIF, alleging that SAIF had violated his rights under the Due Process Clause by terminating his PTD benefits without conducting a hearing *prior* to termination.[3] Plaintiff sought as damages the amount of PTD benefits that SAIF had withheld prior to the evidentiary hearing, unspecified noneconomic compensatory damages, and an injunction barring SAIF from terminating his PTD benefits before conducting an evidentiary hearing.[4]

---

[3] In 2001, no statute or rule required a workers' compensation insurer to conduct an evidentiary hearing before terminating an injured worker's PTD benefits. In 2005, the legislature added subsection (6) to ORS 656.206 to address the procedure for terminating a prior PTD award. Or Laws 2005, ch 461, §§ 1-2. Under that statute, when an insurer notifies a person who receives PTD benefits that it intends to terminate those benefits, if the person requests a hearing prior to termination, that request ordinarily will prevent the insurer from terminating such benefits before the hearing.

[4] Plaintiff's complaint contained class action allegations, and plaintiff purported to assert claims on behalf of a class of similarly situated persons. However,

Section 1983 provides, in part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State[,] * * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * *."

As the text of the statute indicates, to prevail in a Section 1983 action, a plaintiff must prove that a "person" acting "under color of" state law deprived the plaintiff of a federal right. Plaintiff alleged that SAIF was a "person"; that, in terminating his PTD benefits, SAIF had acted under color of state law; and that SAIF's prehearing termination of those benefits had "violated his federal right to due process of law." *Johnson I*, 202 Or App at 268.

SAIF moved for summary judgment on four grounds. First, it argued that it was not a "person" for purposes of Section 1983 because that statute does not include the state or its agencies—or state employees acting in their official capacities—in its use of the word "person." Second, it claimed that neither SAIF nor its president and CEO had acted under "color of state law" in taking the actions alleged in the complaint. Third, SAIF asserted that the claim was moot because plaintiff had received a full evidentiary hearing, albeit after SAIF had terminated plaintiff's PTD benefits. Fourth, SAIF argued that plaintiff's due process claim was barred by claim preclusion because plaintiff failed to raise it when he challenged the termination of his PTD benefits at his administrative hearing. Plaintiff filed a cross-motion for summary judgment, arguing that SAIF's termination of his PTD without a pretermination hearing violated his rights under the Due Process Clause.

The trial court granted summary judgment in favor of defendant on the ground that SAIF is not a "person" subject to an action for damages under Section 1983. The trial

---

neither party moved for an order regarding class certification, and the trial court did not enter such an order. Accordingly, we do not address any class action issues or any factual allegations other than those related to plaintiff.

court also rejected plaintiff's claim for injunctive relief as moot, because plaintiff had already had a post-termination hearing. Although the trial court based its decision on those grounds, the court also accepted two other arguments that SAIF had offered in support of its summary judgment motion: first, that SAIF had not acted under color of state law when it failed to provide plaintiff with a pretermination hearing because SAIF had acted consistently with state statutes and regulations; and, second, that plaintiff's due process claim was barred by claim preclusion because he did not raise that claim at his workers' compensation hearing. Because those rulings were fatal to plaintiff's Section 1983 action, the trial court did not address the merits of plaintiff's procedural due process claim.

Plaintiff appealed to the Court of Appeals. That court affirmed the trial court's summary judgment on the claim for injunctive relief but otherwise reversed. The Court of Appeals concluded that SAIF is not an arm of the state for the purposes of the Eleventh Amendment to the United States Constitution[5] and, therefore, is a "person" that may be sued under Section 1983. Among other grounds for reaching that conclusion, the Court of Appeals, examining one of the considerations that the United States Supreme Court has identified as important in deciding that issue, emphasized that the Oregon State Treasury was not liable for the debts and obligations of SAIF. *Johnson I*, 202 Or App at 293. The court further observed that SAIF is "fiscally independent of the state" and is funded by employer premium payments, not by the state's general fund. *Id.*

The court also concluded, however, that, although SAIF is not an arm of the state for Eleventh Amendment purposes, it was sufficiently tied to the state that it was act-ing "under color of state law" for purposes of Section 1983.

---

[5] The Eleventh Amendment to the United States Constitution provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." The United States Supreme Court has held that that amendment also bars federal courts from hearing claims against a state by its own citizens. *See, e.g., Hans v. Louisiana*, 134 US 1, 10 S Ct 504, 33 L Ed 842 (1890) (so holding).

*Johnson I*, 202 Or App at 296-98. Additionally, the court held that plaintiff's claim was not barred by claim preclusion because the board did not have authority to award the civil damages that plaintiff claimed and because his challenge was not to any board hearing procedure, but rather to SAIF's actions *before* the hearing. *Id.* at 299-300.

SAIF moved for reconsideration, challenging the Court of Appeals' holding that SAIF was not an arm of the state for Eleventh Amendment purposes and, therefore, that it was a "person" subject to Section 1983 claims. In support of that motion, SAIF filed affidavits to refute the Court of Appeals' statement that SAIF was fiscally independent of the state treasury. SAIF's submissions included documents showing that the Risk Management Division of the Department of Administrative Services had paid certain tort claims against SAIF. The Court of Appeals allowed reconsideration, but adhered to its prior opinion. *Johnson II*, 205 Or App 41. According to the Court of Appeals, even assuming that the court could take judicial notice of the submitted documents, they demonstrated only that SAIF participates in a state-managed insurance fund that operates on an actuarial basis, is separate from the general fund, and is open to participation by local government entities that are not arms of the state. In the Court of Appeals' view, SAIF's participation in the state's risk management pool did not change its conclusion that SAIF was not an "arm of the state" for Eleventh Amendment purposes. *Id.* at 47.

SAIF petitioned this court for review of two issues that the Court of Appeals decided. First, is SAIF a "person" subject to suit under Section 1983? And, second, is plaintiff precluded from asserting his due process claim in this action due to his failure to raise that claim in hearings before the ALJ and the board? We affirm the Court of Appeals' resolution of those questions, although our analysis differs in some respects. Because the issues as presented to us involve only whether plaintiff may maintain his Section 1983 action against SAIF, we do not reach the merits of plaintiff's claim that SAIF violated plaintiff's federal due process rights.

## II.  MEANING OF "PERSON" UNDER SECTION 1983

### A.  *Parties' Arguments and Preliminary Discussion*

SAIF argues that it is immune from Section 1983 claims because it is not a "person" for purposes of that statute. Similarly, it argues that its president and chief executive officer, although obviously a natural person, is not a "person" for purposes of Section 1983 because the claims against that officer are based on actions taken within the scope of her official duties.

██ SAIF seeks to bring itself within the rule of *Will v. Michigan Dept. of State Police*, 491 US 58, 70, 109 S Ct 2304, 105 L Ed 2d 45 (1989), where the United States Supreme Court held that Congress did not intend Section 1983 to apply to the "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." Whether a particular state entity "has the same kind of independent status as a county or is instead an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law." *Regents of University of California v. Doe*, 519 US 425, 429 n 5, 117 S Ct 900, 137 L Ed 2d 55 (1997). To answer that federal question, however, requires us to consider the provisions of *state* law "that define the agency's character." *Id.* Although the Supreme Court has not articulated and applied a consistent test for determining whether a state entity is entitled to Eleventh Amendment immunity, the controlling cases make it apparent that immunity is a case-specific inquiry that turns on whether "the state is the real, substantial party in interest." *Pennhurst State School & Hosp. v. Halderman*, 465 US 89, 101, 104 S Ct 900, 79 L Ed 2d 67 (1984) (internal quotation marks omitted). That determination, in turn, depends on weighing a variety of factors that the Supreme Court has identified as relevant to determining the "nature" of the state entity.[6] Our task, then, is to determine whether the state is

---

[6] The Court of Appeals thoughtfully reviewed the case law on this issue and concluded that the Supreme Court has applied tests involving from two to six different "factors," while the federal courts of appeals have applied tests that include from four to nine factors, with some courts determining that certain factors are more important and other courts treating the factors as equally important. *Johnson I*, 202 Or App at 272-76.

the "real, substantial party in interest" in an action against SAIF, and we make that determination by applying to SAIF the factors that the Supreme Court has identified.

■ The Supreme Court has stated that, "[w]hen deciding whether a state instrumentality may invoke the State's immunity, our cases have inquired into the relationship between the State and the entity in question." *Doe,* 519 US at 429. That inquiry includes, necessarily, consideration of the " 'nature of the entity created by state law' to determine whether it should 'be treated as an arm of the State,' " *Doe,* 519 US at 429-30 (footnotes and citation omitted). The inquiry also includes—as a question of "considerable importance"—"whether a money judgment against a state instrumentality or official would be enforceable against the State[.]" *Id.* at 430. We therefore agree with the Court of Appeals that we must consider both the characterization of SAIF under state law and whether the state treasury may be liable for a judgment against SAIF. *See Johnson I,* 202 Or App at 275-76 (identifying those two factors as "at the forefront of Eleventh Amendment 'arm-of-the-state' analysis").

The Supreme Court also has stated that other "indicators of immunity" can be relevant in determining whether a particular entity is an arm of the state for Eleventh Amendment purposes. *Hess v. Port Authority Trans-Hudson Corporation,* 513 US 30, 44, 115 S Ct 394, 130 L Ed 2d 245 (1994). In *Hess,* those indicators included whether the officials in charge of the entity—in that case, a bi-state public corporation—were selected locally or statewide; the states' authority to control the entity's actions or change the scope of its activities; and whether the entity received operating funds from the states. *Id.* at 44-46. Some lower courts applying *Hess* have identified those "indicators of immunity" as a separate step in determining Eleventh Amendment immunity, *e.g., J.A.W. v. State of Indiana,* 687 NE 2d 1202, 1205-06 (Ind 1997), while others have used them to determine the extent to which an entity's "autonomy" is constrained by state authority, *e.g., Bowers v. National Collegiate Athletic Ass'n,* 475 F3d 524, 546 (3d Cir 2007), or have subsumed them within the broader "analysis concern[ing] how the state has structured the entity[,]" *Fresenius Medical Care*

*Cardiovascular Resources, Inc. v. Puerto Rico*, 322 F3d 56, 65 (1st Cir 2003).

In this case, the Court of Appeals considered some, although not all, of the other "indicators of immunity" identified in *Hess* as part of its "analysis of how SAIF has been characterized under Oregon law." *Johnson I*, 202 Or App at 276 n 4. We agree with the Court of Appeals that the many factors that the Supreme Court has identified as relevant at one time or another can be subsumed within the two primary tests described above—the characterization and nature of the entity under state law and the liability of the state for the financial obligations of the entity—and that breaking the analysis back down into further discrete steps does not serve a useful purpose. *Id.* at 276. Moreover, we apply those tests, as *Hess* requires, in light of the two concerns—"the States' solvency and dignity"—that "underpin the Eleventh Amendment." *Hess*, 513 US at 52.

B. *Characterization of SAIF under State Law*

The Court of Appeals exhaustively reviewed the history of SAIF, from the 1913 establishment of the Industrial Accident Fund (IAF) and early court decisions involving the State Industrial Accident Commission (SIAC) to the legislature's creation of SAIF as an "independent public corporation" in 1979 and this court's post-1979 cases discussing the relationship between SAIF and the state. *Johnson I*, 202 Or App at 278-91. Based on that review, the Court of Appeals could conclude only that "for some purposes SAIF is treated as an arm of the state, and for some purposes it is not." *Id.* at 293. As one of the two primary factors to be considered in determining Eleventh Amendment immunity, therefore, the court stated that the characterization of SAIF under state law "does not strongly weigh either for or against * * * immunity." *Id.* at 294.

Based on our own review of the statutes and cases characterizing SAIF, as we discuss below, we conclude that they provide some weight in favor of the conclusion that SAIF is not an arm of the state. SAIF is not a state "agency" in the same sense as those departments of state government that are under the direct control of the governor (or of the legislative or judicial branches). In creating the Department of

Human Services, for example, the legislature provided, "The Department of Human Services is created[,]" ORS 409.010(1). In creating SAIF, in contrast, the legislature used words plainly intended to set SAIF apart from other state departments and to establish it as an independent entity: "The State Accident Insurance Fund *Corporation* is created as an *independent* public *corporation.*" ORS 656.751(1) (emphases added). Indeed, the 1979 legislation creating SAIF directed Legislative Counsel to "substitute, for words designating the State Accident Insurance Fund as an agency, words designating the State Accident Insurance Fund *Corporation.*" Or Laws 1979, ch 829, § 8 (emphasis added).

■     SAIF properly points out that the state may choose to conduct its business through different kinds of entities, including departments, agencies, boards, or corporations of various kinds, and the fact that the legislature chose to use the "corporate" form in creating SAIF does not mean that SAIF is not an arm of the state. We agree that the mere fact that SAIF was created as a public corporation rather than as a typical state agency does not necessarily mean, as plaintiff argues, that'SAIF is not an arm of the state for Eleventh Amendment purposes. However, the legislature's choice of form for the entity that it creates *does* provide some indication of its view of the "nature" of that entity and, when viewed in the context of the powers of the entity and its exemption from statutes otherwise applicable to state agencies, supports our conclusion. It is undisputed that the 1979 Legislative Assembly intended to change the character of SAIF by making it less like a state agency and more like a private insurance carrier. As the Court of Appeals concluded after reviewing the legislative history of the 1979 statutory changes, "the legislature intended SAIF to have a business purpose and function apart from traditional governmental business and to have political and fiscal independence." *Johnson I*, 202 Or App at 291-92.

We can further explore the "nature of the entity created by state law," *Doe*, 519 US at 429, by examining the specific purposes for which SAIF was created, the powers that the legislature gave to SAIF, and SAIF's exemptions from laws generally applicable to state agencies. We do so by looking at the statutes respecting SAIF, some of this court's cases

involving SAIF, and the financial relationship between SAIF and the state. The legislature has told us that:

> "[SAIF] is created for the purpose of transacting workers' compensation insurance and reinsurance business. [SAIF] also may insure an Oregon employer against any liability such employer may have on account of bodily injury to a worker of the employer arising out of and in the course of employment as fully as any private insurance carrier."

ORS 656.752(1). That statute sets out the legislature's intent to create a state corporation to engage in the "insurance and reinsurance business" in competition with private insurance carriers.[7] ORS 656.752 authorizes SAIF to engage in activities necessary to participate in the insurance business, including collecting premiums and fees and processing claims. That statute also specifically provides that SAIF can sue and be sued in its own name, can own and manage real property in its own name, and is subject to local property taxes. *See* ORS 656.752(3), (5), (6) (so providing). SAIF is governed by a board of five directors, appointed by the governor and subject to confirmation by the Senate, who serve at the pleasure of the governor. ORS 656.751(1), (3). The SAIF board, in turn, selects the manager, who serves at the pleasure of the board. ORS 656.754.

As significant as the authority that the legislature has given SAIF to act more independently than the ordinary state agency are the exemptions that the legislature has provided from state statutes that apply to state agencies. SAIF is exempt from the pervasive state regulations contained in the state personnel relations law, public contracting and purchasing statutes, state printing statutes, interagency services statutes, state financial administration statutes, and statutes respecting the administration of public funds. ORS 656.753(1).

SAIF, of course, is subject to certain other statutes that apply to state entities. SAIF's legal representation in

---

[7] As SAIF's manager testified in support of the 1979 legislation that established SAIF as an independent public corporation, the legislation recognized "that SAIF is not a state agency in the true sense, but a self-supporting, non-profit insurance fund[.]" Written Testimony, House Labor Committee, SB 255, June 6, 1979 (statement of Charles Gill).

civil actions and proceedings, like that of the State of Oregon generally, is subject to the "[g]eneral control and supervision" of the Department of Justice under ORS 180.220(1). *See Frohnmayer v. SAIF*, 294 Or 570, 660 P2d 1061 (1983) (so holding). SAIF is subject to the public meetings law, ORS 192.610 to 192.690. *See Frohnmayer*, 294 Or at 581 n 7 (discussing legislature's consideration and rejection of SAIF request to be exempt from public meetings law). SAIF may, and does, participate in a state insurance pool with other state and local government entities to cover its tort liabilities, as we discuss in greater detail below.

This court has referred to SAIF as a "state entity," *Eckles v. State of Oregon*, 306 Or 380, 387, 760 P2d 846 (1988), and as an "instrumentality for a governmental objective * * *." *State ex rel Eckles v. Woolley*, 302 Or 37, 48, 726 P2d 918 (1986). Yet neither of those shorthand descriptions provide guidance in applying the tests for Eleventh Amendment immunity, other than to make the obvious and undisputed point that SAIF is not a "private" entity or an entity of local government. Indeed, the legal issues at stake in *Eckles* demonstrate that, in that case, this court viewed SAIF as an entity distinct from the state acting *qua* state. In *Eckles,* this court considered constitutional and contractual challenges to a statute that directed the state treasurer to transfer $81 million from the IAF to the general fund. 306 Or at 382. SAIF itself was not a party in *Eckles.* This court held, in part, that the statute impaired the state's contractual obligation to SAIF's insureds, set out in statute, to maintain the IAF as a trust fund exclusively for workers' compensation purposes. 306 Or at 402. In analyzing that issue, this court distinguished between the "state" and SAIF, noting that, if the statute "impaired a contractual obligation stated in ORS 656.634, [it] impaired an obligation of the state rather than an obligation of SAIF." 306 Or at 389. This court thus contrasted the role of SAIF, as an "independent public corporation" providing workers' compensation insurance, with the "state," acting through the passage of legislation.

A final factor in determining the "nature" of SAIF for Eleventh Amendment purposes is the state's financial relationship with SAIF. That factor is distinct from the question, discussed below, of whether a judgment against the entity is,

in effect, a judgment against the state treasury. *Compare Hess*, 513 US at 44, 45 (discussing that entity in question was "fiscally independent" and that states "lack[ed] financial responsibility" for it) *with id.* at 51 (discussing, as a separate factor, whether judgment against entity must be satisfied out of state treasury). It is undisputed that SAIF is financially independent from the state; that is, SAIF receives no general fund revenues, and its operating funds all come from the IAF. *See* ORS 656.632(3) (all payments made by SAIF, including "all salaries" and "all other expenses," shall be paid from the IAF). Moreover, the state has declared that "it has no proprietary interest" in the IAF and has disclaimed "any right to reclaim" the contributions that it made to the IAF more than 70 years ago. ORS 656.634(2).[8]

The foregoing examination of how SAIF is characterized in Oregon statutes and cases reveals, not surprisingly, that some statutes treat SAIF as an "arm of the state," like other agencies of state government, while other statutes point towards the more independent status of an entity created by state law that does not share the Eleventh Amendment immunity accorded to "one of the United States." *Doe*, 519 US at 429 n 5. The factors that lend support to SAIF's claim that it is an arm of the state are the governor's ultimate control over SAIF, through the power to appoint and remove members of the board, and the legislature's plenary authority to alter, abolish, or modify SAIF or its structure. However, those factors—even without considering the factors that point in the other direction—do not weigh heavily in favor of immunity. In *Hess*, the Supreme Court held that state control is not "dispositive," noting that "ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates." 513 US at 47. There, the Court rejected an immunity claim despite the fact that the entity was created by two states that had the authority to veto the entity's actions, appoint or remove commissioners, and otherwise control the entity. The Court observed that

---

[8] In the trial court, SAIF submitted an affidavit stating that "SAIF employees are paid by SAIF, not by the State of Oregon"; that "SAIF receives no operating subsidies from the State of Oregon"; and that SAIF pays no funds to governmental entities except taxes and—to the extent those government entities are SAIF policyholders—dividends.

"[g]auging actual control" can be "a perilous inquiry, an uncertain and unreliable exercise." *Id.* (internal quotes omitted). In this case, although the state retains control over SAIF and the legislature could change the nature of SAIF any time, the fact that the state may not interfere with the IAF, through which SAIF funds its operations, limits the state's control, as a practical matter.

The factors indicating that SAIF is not an arm of the state for Eleventh Amendment purposes include the legislature's decision not to establish SAIF as a state agency or department, but instead as an "independent public corporation" with exemptions from many statutes applicable to state agencies. Additionally, SAIF is financially independent of the state. No general fund dollars flow to SAIF, and the IAF, which funds all of SAIF's operations, may not be tapped by the state for general fund purposes, but rather is held in a statutory trust. ORS 656.634 (IAF is a "trust fund"). In statutory authority, fiscal independence, and operational reality, SAIF has significantly more autonomy than most other state agencies and departments. Of the factors that the Supreme Court has identified as important in the "characterization" of SAIF under state law, those indicating that SAIF is not an arm of the state for purposes of Eleventh Amendment immunity outweigh those in favor of immunity.[9]

C. *Whether the State Treasury is Liable for SAIF's Torts*

We turn to the second test that the Supreme Court consistently has used to determine if a state entity is an arm of the state for purposes of the Eleventh Amendment: "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise?" *Hess,* 513 US at 51. The Court has said that,

---

[9] Comparisons of SAIF and state entities considered by other courts are of limited utility because of the inevitable variations in state statutes. Nevertheless, we note that the Colorado Supreme Court has held that the Colorado Compensation Insurance Authority (CCIA) was not immune from a Section 1983 action. *Simon v. State Compensation Ins. Authority,* 946 P2d 1298 (Colo 1997). Although the CCIA was administered by a board appointed by the governor, that factor was outweighed by other characteristics of CCIA, including that it was established as a "body corporate and political subdivision of the state," rather than as a state agency; that it received no general fund money from the state; that it was exempt from state personnel statutes; and that it administered a fund that could not be used for other purposes. *Simon,* 946 P2d at 1309.

when the answer is "no," the Eleventh Amendment's core concern is not implicated. *Id.* As noted previously, the Court also has cautioned that a state's legal liability for a judgment against the entity should not be "a formalistic question of ultimate financial liability"; rather, financial liability is "an indicator of the relationship between the State and its creation * * *." *Doe*, 519 US at 431.

Plaintiff argues that this court's decision in *Bennett v. State Ind. Acc. Com.*, 203 Or 275, 279 P2d 655 (1955), is dispositive because the court there stated that "no claim or judgment against the State Industrial Accident Commission can be paid out of any moneys belonging to the State of Oregon * * *." *Id.* at 280. SAIF is correct, however, that *Bennett* was a case involving a claim for workers' compensation benefits, which, then, as now, could be paid only from the IAF. As SAIF points out, plaintiff's Section 1983 claim here does not seek workers' compensation benefits, but rather is a claim against SAIF for damages for SAIF's alleged violation of plaintiff's federal constitutional rights. Although this court's statement in *Bennett* provides some support to plaintiff's position, that case arose in a different context and predated the creation of SAIF as an independent public corporation. It is not dispositive here.

The issue under this part of the *Hess* inquiry is whether the state treasury is liable for the debts of SAIF. SAIF argues that it is. SAIF bases that argument primarily on the fact that it participates in the insurance fund established (primarily) for the benefit of state and local governmental entities and that tort claims against SAIF are paid out of that fund in the same manner as tort claims against "any other more traditional state agency." However, the insurance fund, as its name suggests, is essentially an insurance policy. It operates on an actuarial basis, ORS 278.435(1), is financed by assessments based on "relative risk and loss experience[,]" ORS 278.435(3), and, significantly, is "separate and distinct from the General Fund * * *." ORS 278.425(1). SAIF's argument would have greater force if SAIF, like some other state agencies, paid *its* insurance fund assessments out of general fund appropriations. However, SAIF's risk pool assessments, like its workers' compensation payments, personnel costs, and "all other expenses," ORS

656.632(3), are paid out of the IAF. Moreover, participation in the risk pool is open to local public bodies, ORS 30.282(4), and to some private entities, such as nonprofit child care facilities, ORS 278.322, and that fact does not make the state liable for the obligations of those entities. We agree with the Court of Appeals' conclusion that the fact that SAIF participates in the state's insurance fund—using IAF money to do so—does not mean that the state treasury is at risk for tort claims against SAIF. *Johnson II*, 205 Or App at 47.[10]

SAIF further argues that, notwithstanding the self-funding nature of the insurance fund, the state ultimately is liable for the torts of SAIF (and other insurance fund participants) because ORS 278.435(5) provides that, if charges against the insurance fund exceed money in the fund in any year, the state treasury "may" advance funds to cover the shortfall. Even if "may" in that context is read as "shall," and the state treasury therefore were obligated to advance such funds, ORS 278.435(6) requires that any funds so advanced must be repaid to the state treasury, with interest, within 10 years. And, that repayment is to be made by assessments from participants in the risk pool, ORS 278.435(7), which presumably means that SAIF's part of the repayment, like all its other expenses, would come out of the IAF. SAIF's argument that its participation in the insurance fund demonstrates that a judgment against it "must be paid out of [the] State's treasury[,]" *Hess*, 513 US at 48, is not persuasive.

SAIF also points out that, in *Doe*, the Supreme Court emphasized that the relevant issue for Eleventh Amendment purposes is not whether an entity can be reimbursed or obtain insurance for claims against it, but, rather, "the entity's potential legal liability * * *." 519 US at 431. In our view, however, that argument undercuts SAIF's position. SAIF has pointed to no case, statute, rule, or state policy *other* than its participation in the state's risk management pool that suggests that the state treasury would be liable for a judgment against SAIF. On the contrary, the legislature

---

[10] In *Simon v. State Compensation Ins. Authority*, discussed at 343 Or at 153 n 9, the Colorado Supreme Court rejected a similar argument that the state-created worker compensation insurer was an "arm of the state" for Eleventh Amendment purposes because it participated in the state risk management fund. *Simon*, 946 P2d at 1310.

created SAIF as an independent public corporation, which suggests that the legislature did not intend for the state to be liable for SAIF's obligations. Although we need not definitively resolve the issue as to SAIF, a party that obtains a judgment against a "corporation" ordinarily cannot look beyond the assets of the corporation to the corporation's shareholders, owners, or incorporators to satisfy that judgment. SAIF's organization as an independent public corporation thus supports plaintiff's argument that the legislature did not intend for the state treasury to be liable for SAIF's obligations. Finally, as discussed above, *all* expenses of SAIF are to be paid by the IAF, ORS 656.632(3), which is separate and distinct from the general fund (and from other state funds), and in which the state has disclaimed all interest. ORS 656.634(2).[11]

In sum, the second factor from *Hess* used to determine whether a particular state entity is an arm of the state for Eleventh Amendment immunity purposes—whether the state treasury is at risk for the liabilities of the entity—supports the conclusion that SAIF does not enjoy such immunity and therefore can be sued under Section 1983. Applying that conclusion here, we hold that the trial court erred in granting summary judgment to SAIF on the ground that SAIF did not qualify as a person under Section 1983.

## III. CLAIM PRECLUSION

**6.** SAIF also argues on review that plaintiff's Section 1983 claim is barred because plaintiff could have, but did not, raise that claim in his workers' compensation proceeding. The Court of Appeals rejected that argument for two reasons. First, it noted that, although administrative agencies generally have authority to consider the constitutionality of their own proceedings, plaintiff's claim did not challenge the constitutionality of any aspect of the hearings process itself, but rather "the constitutionality of the process by which SAIF determined that [plaintiff] was no longer entitled to PTD

---

[11] ORS 656.634(2) provides that the state's disclaimer of any interest in the IAF is subject to the right of the state "to direct legislatively the disposition of any surplus in excess of reserves * * *." Because this case does not involve any such direction by the legislature, we do not consider the meaning of that part of the statute.

benefits *before* any of the hearings division proceedings even commenced." *Johnson I,* 202 Or App at 299 (emphasis in original). Second, the Court of Appeals held that plaintiff's civil claim was not precluded because the hearings division had no authority to determine civil liability or to award damages. *Id.* at 300.

On review, SAIF acknowledges that, in many circumstances, a person who alleges a deprivation of a federal right may bring a Section 1983 claim regardless of what state remedies may be available to the person and whether or not the person took advantage of those remedies. However, relying upon *Zinermon v. Burch,* 494 US 113, 110 S Ct 975, 108 L Ed 2d 100 (1990), SAIF argues that, when a plaintiff brings a Section 1983 claim alleging a violation of *procedural due process,* the plaintiff "must avail himself of the processes provided to ripen his claim." That argument is based on the following passage from *Zinermon:*

> "The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law."

494 US at 126. From that premise, SAIF argues, "Had plaintiff followed the procedures prescribed by state law, those procedures might well have provided him with all the process due."

SAIF's argument misses the mark for two reasons. First, it misconstrues the nature of plaintiff's claim here. As the Court of Appeals recognized, "the constitutionality of the hearings division proceedings themselves was not in dispute." *Johnson I,* 202 Or App at 299. Rather, plaintiff's challenge centered on *SAIF's* action in terminating his PTD benefits. That action took place *before* any hearing occurred. Moreover, SAIF's termination of plaintiff's PTD benefits was

not prohibited by any statute or regulation, and it was independent of the post-termination hearing process available under the board's rules. By the time that plaintiff was entitled to seek a hearing, in the words of *Zinermon*, not only had the "deprivation occur[red]," but SAIF already allegedly had failed "to provide due process"—at least the level of due process that plaintiff asserts was required.

SAIF's argument also fails because it conflates the merits of plaintiff's due process claim, which is not at issue before this court, with its argument that plaintiff's claim is precluded because he failed to raise it in the workers' compensation proceeding. SAIF argues that, because plaintiff failed to raise his claim that he was entitled to a *pre*termination hearing in the *post*-termination hearing that he was afforded, he bypassed "procedures that might well have provided him with all the process that was due." Yet plaintiff's Section 1983 claim is precisely that, *because* SAIF failed to provide him a pretermination hearing, he did *not* receive all the process that he was due. SAIF may be correct that the Due Process Clause does not require that plaintiff receive a pretermination hearing, but that substantive issue is not before this court, and it is distinct from the question whether plaintiff was required to raise his constitutional argument in his workers' compensation proceeding. We conclude that he was not.

## IV. CONCLUSION

For the reasons set forth above, we hold that SAIF does not share the state's immunity under the Eleventh Amendment and therefore is a "person" for purposes of claims under 42 USC section 1983. We further conclude that plaintiff's Section 1983 claim is not barred by his failure to raise it in his workers' compensation proceedings. Whether the Due Process Clause required SAIF to afford plaintiff a hearing before terminating his PTD benefits is a question for another day.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded for further proceedings.